UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA,

v.  Case No. 8:23-cr-245-KKM-SPF

DANIEL N. PULLEY,

    Defendant.
_____

## ORDER

    While on supervised release following a conviction for possessing child pornography, Daniel Pulley asked his probation officer for permission to have a smartphone. The officer agreed. Consistent with Pulley's conditions of supervised release, the officer asked to inspect the phone, and Pulley gave the phone to her. On it, the officer found evidence that Pulley had visited a pornographic website, and Pulley admitted that he had. The officer then confiscated and searched the phone, revealing that Pulley possessed a second, unauthorized phone. A search of that second phone uncovered that Pulley obtained child pornography and exchanged sexual messages with a child.

The government indicted Pulley for producing and possessing child pornography. Indictment (Doc. 1). Pulley moves to suppress most of the evidence. Mot. to Suppress (Doc. 41) (MTS). According to Pulley, the threat that his supervised release might be revoked compelled him to follow his probation officer's instructions to turn over the first phone and to answer her questions, so any evidence that flows from that interaction must be suppressed under the Fifth Amendment's self-incrimination clause. Because no reasonable person in Pulley's position would believe that his supervised release would be revoked if he asserted the Fifth Amendment in response to the officer's instruction and question, Pulley's motion is denied.

## I. BACKGROUND

Pulley pleaded guilty in 2009 to possessing child pornography, and a federal court sentenced him to 60 months' imprisonment and ten years' supervised release. Crim J. (Doc. 41-1) at 40–42. The sentencing court imposed the standard supervised-release conditions, including, among other things, that Pulley had to "answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer." *Id.* at 42; *see* U.S.S.G. § 5D1.3(c)(3) (2009). The sentencing court also imposed special conditions that restricted Pulley's internet use and

required him to receive "written approval from the probation officer" before using the internet. Crim J. at 43. If allowed to possess an internet-enabled device, the conditions mandated that Pulley "permit routine inspection" to enforce the terms of his release. *Id.*

Around 2016, Pulley violated several terms of supervised release, including by receiving a photo of "a nude minor." Tr. 8:23–9:7. Even still, the probation officer asked "to continue working with [] Pulley" and did not ask the court to revoke his supervised release. *Id.* 9:8–10.

A few years later—nearing the end of his supervised-release term—Pulley requested a smartphone. *Id.* 9:18–11:5. Pulley's probation officer conditionally approved his request, and she instructed him to install parental control software on the phone and not to access the internet. *Id.* 11:19–23, 12:12–25; *see also* Crim J. at 43 ("The defendant shall not possess or use a computer with access to any online service at any location . . . without written approval from the probation officer."). After obtaining a phone, Pulley gave his probation officer his number. *See* Tr. 13:10–18, 28:23–29:6. The probation officer told Pulley that she would inspect the phone during a routine home visit in October 2022 to complete the approval process. *Id.* 14:14–15:5.

3

As expected, during that visit the officer asked Pulley to give her the phone. *Id.* 16:17–22. He did so. *Id.* The officer checked to see if Pulley had installed the parental control software, and she checked his internet history. *Id.* 18:4–23. His internet history revealed that he had accessed pornography sites. *Id.* 18:22–25. When the probation officer questioned him, Pulley admitted that he had visited the sites. *Id.* 19:9–10. The officer then confiscated the phone. *Id.* 19:10–12. At no point did the officer tell Pulley that he had to answer her questions or comply with her instructions. *Id.* 19:20–21, 20:6–8. Nor did she tell him that if he failed to answer or comply, then he would have his supervised release revoked and be sent back to jail. *Id.* 16:7–12, 17:20–18:3, 19:13–19, 19:25–20:5.

After searching the phone, investigators found a selfie of Pulley holding a different smartphone. *Id.* 31:22–32:2; 41:3–18. Based on that evidence, Pulley's probation officer searched his home in December 2022 and seized a second phone. *Id.* 32:17–19. Pulley admitted that he bought that second phone in 2021 without authorization and used it to access the internet and social media. *Id.* 22:19–23:19, 24:13–14; 32:20–24. He had unauthorized SnapChat and WhatsApp accounts on the phone, which revealed evidence of a sexual relationship with a minor. *Id.* 32:23–33:5, 45:3–46:6. Investigators later interviewed a minor victim and accessed her

4

phone and SnapChat account. MTS at 1. Based on the social media accounts and evidence from the minor victim, Pulley was indicted for producing and possessing child pornography. *See* Indictment.

Pulley alleges that his initial interactions with his probation officer—handing her the phone and his statements about the phone—were compelled in violation of the Fifth Amendment. MTS. Pulley moves to suppress (1) any evidence that he provided the first phone to his probation officer, (2) the statements he made about the first phone, (3) the first phone itself; (4) the second phone, (5) the testimony of the alleged victim, (6) Pulley's and the victim's SnapChat accounts, and (7) any other evidence derivative of the probation officer's October 2022 visit. *Id.* at 1.

## II. LEGAL STANDARD

The Fifth Amendment guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend V. Beyond protecting against being forced to testify as a witness in one's own trial, "the right [also] bars the introduction against a criminal defendant of out-of-court statements obtained by compulsion." *Vega v. Tekoh*, 597 U.S. 134, 141 (2022). That safeguard includes incriminating statements or testimonial acts extracted from a defendant while on probation or supervised release. *See Minnesota v. Murphy*, 465 U.S. 420,

426 (1984). To succeed on a motion to suppress evidence under the Fifth Amendment's self-incrimination clause, a defendant must show that (1) the government compelled him to act or speak, (2) that act or speech was testimonial, and (3) the act or speech incriminated him. *See Hiibel v. Sixth Jud. Dist. Ct. of Nev., Humboldt Cnty.*, 542 U.S. 177, 189 (2004); *In re Grand Jury Subpoena Duces Tecum Dated Mar. 25, 2011*, 670 F.3d 1335, 1341 (11th Cir. 2012).

Because "[t]he privilege against self-incrimination 'is an exception to the general principle that the [g]overnment has the right to everyone's testimony,' " a defendant ordinarily must invoke the right to avail himself of it. *Salinas v. Texas*, 570 U.S. 178, 183 (2013) (quoting *Garner v. United States*, 424 U.S. 648, 658 n.11 (1976)). "[T]he classic penalty situation" presents one of the few narrow exceptions. *Murphy*, 465 U.S. at 435. Under that situation, a person's failure to invoke the privilege is excused—and his statement is deemed compelled—if invocation would subject him to a "substantial penalty" that "denies him 'a free choice to admit, to deny, or to refuse to answer.' " *McKathan v. United States*, 969 F.3d 1213, 1224 (11th Cir. 2020) (quoting *Garner*, 424 U.S. at 657).

To decide whether a supervised-release condition creates a "classic penalty situation," a court uses two steps. *Id.* at 1226. A court first decides whether the

6

condition threatens revocation (or another substantial penalty) as a sanction for exercising the Fifth Amendment privilege. *Id.* If the condition does not, then the court asks whether a reasonable person in the defendant's position would "have thought that his invocation of his Fifth Amendment privilege would result in revocation of his supervised release." *Id.* This inquiry is objective and based on the totality of the circumstances. *Cf. Arizona v. Fulminante*, 499 U.S. 279, 285 (1991); *United States v. Smith*, 821 F.3d 1293, 1304–05 (11th Cir. 2016). Relevant factors might include (1) the defendant's release conditions, (2) the circumstances of the statement or act, (3) any representations by the probation officer, and (4) binding precedent on when revocation is permissible. *See Murphy*, 465 U.S. at 437–39; *McKathan*, 969 F.3d at 1226–31.

## III.   ANALYSIS

Pulley says that he faced a classic penalty situation under *Murphy*'s second step[1] when his probation officer asked him for his phone and questioned him about the websites that he had visited. MTS at 6–13. Because the other evidence he

---

[1] Because Pulley does not argue that his release conditions by themselves created a classic penalty situation, I need not address *Murphy*'s first step.

7

outlines stems from that compelled testimonial act and statements, he argues all the derivative evidence should be suppressed. *Id.* at 1.

I disagree. As explained below, I conclude that Pulley did not face a classic penalty situation. The government did not compel his act or statements under a threat of revocation (implicit or otherwise), and its evidence—all of it—need not be suppressed.[2]

### A. The Government Did Not Compel Pulley to Produce the First Phone

Pulley argues that his probation officer compelled him to produce his phone because a reasonable person in his place would believe that failing to do so would cause his supervised release to be revoked. He claims that his case is indistinguishable from *McKathan v. United States*, in which the Eleventh Circuit held that supervised-release conditions identical to Pulley's placed McKathan in a classic penalty situation. 969 F.3d at 1230–31. But the totality of the circumstances that Pulley faced differs markedly from that in *McKathan* and compels a different result.

To start, nothing in Pulley's supervised-release conditions suggests he would be penalized for invoking the Fifth Amendment. The relevant condition here—that

---

[2] Because I conclude that the government did not compel Pulley to act or speak, I do not address whether his act or statements were testimonial or whether they incriminated him.

Pulley "shall answer truthfully all inquiries by the probation officer and follow [the officer's] instructions"—does not address the Fifth Amendment at all. Crim J. at 42; *cf. McKathan*, 969 F.3d at 1226 ("[T]hese supervised-release provisions, on their face, prohibit only false statements."). And unlike in *McKathan*, the condition here does not even have revocation expressly attached as a possible sanction. *Compare* Crim J. (not specifying a sanction for violating the answer-truthfully-and-follow-instructions condition), *with McKathan*, 969 F.3d at 1226 (explaining that McKathan's conditions specified that "upon a finding of a violation of supervised release, the court may revoke supervision" (cleaned up)); *see also* Crim J. at 43 (specifying revocation as a possible sanction for failing to submit to a search). Nothing in his criminal judgment thus told Pulley that a court would revoke his supervised release if he asserted the Fifth Amendment privilege.

More importantly, Pulley's probation officer never told him that taking the Fifth would put him at risk of revocation. The officer asked to see Pulley's first phone as part of the prearranged process to approve Pulley's possession of the phone. *See* Tr. 14:21–15:9. At no point did she threaten Pulley or tell him that if he refused to comply, he might go back to prison. *Id.* 16:7–12, 17:20–18:3, 19:13–19, 19:25–20:5. On the other hand, the probation officer in *McKathan* was investigating McKathan

9

for a potential violation of his release conditions and "instructed [McKathan] that 'if he did not follow the conditions of his supervised release, he'd be revoked and go back to prison.' " 969 F.3d at 1228–29 (alterations adopted). Quite the opposite here, where Pulley's probation officer asked for the phone only in response to Pulley's request to have one. Nothing in the record suggests that Pulley had reason to believe he was being investigated or that he was informed that any failure to comply with his release conditions might result in revocation.

Caselaw would also not have given Pulley reason to worry, either, as no case holds that a court may revoke supervised release based on a failure to "follow the instructions of the probation officer." Crim. J. at 42. In *McKathan*, the Eleventh Circuit relied heavily on the notion that a reasonable person in McKathan's shoes would be aware of *United States v. Robinson*, 893 F.2d 1244 (11th Cir. 1990) (per curiam). 969 F.3d at 1226–27. *Robinson* held that a court could revoke probation if the probation agreement required the probationer "to respond completely and truthfully to questions asked by the probation officer" and the probationer pleaded the Fifth in response to such a question. 893 F.2d at 1244–45. But *Robinson* said nothing about whether a court could revoke release for refusing to follow an officer's instructions, if that refusal were based on the Fifth Amendment—nor do the parties

10

point to any other case for that proposition.[3] Caselaw thus does not support a reasonable belief that refusing to turn over the first phone would have caused Pulley's release to be revoked.

In fact, Pulley's own history with supervised-release violations points the same way. In 2016, Pulley possessed a photo of "a nude minor," Tr. 8:23–9:7, thereby violating the special release condition "prohibit[ing him] from possessing . . . any . . . literature depicting children in the nude and/or in sexually explicit positions," Crim. J. at 43. Despite this violation's apparent severity, the probation office did not seek revocation of his release, nor did the district court hold a hearing to consider revocation. Tr. 9:8–10.

In sum, a reasonable person in Pulley's position would know (1) nothing in his conditions of release told him that his release would be revoked if he did not give

---

[3] To be sure, *McKathan* also involved a probation officer's instruction to "enter [a] PIN to unlock [a] phone." 969 F.3d at 1218. McKathan himself subjectively believed that "his supervised release 'would certainly have been revoked' if he had refused to enter his phone's PIN." *Id.* at 1229. Yet the *McKathan* court rested its conclusion that McKathan was in a classic penalty situation not on the follow-instructions condition but on the answer-truthfully condition. *See, e.g., id.* at 1228 ("[A] reasonable person in McKathan's position would understand *Robinson* to authorize punishment for a supervised releasee's refusal to answer his probation officer's questions."); *id.* at 1231 ("[U]nder *Murphy*, *Robinson* creates the 'classic penalty situation' here, where the supervised[ ]releasee's statements, coerced on pain of revocation for invocation of the Fifth Amendment privilege, were used against him in a separate criminal case."). *Robinson*—the main authority animating *McKathan*—dealt only with the answer-truthfully condition. *See* 893 F.2d at 1244–45. *McKathan* is thus best read to hold that *Robinson* created a classic penalty situation as to that condition alone.

the officer the phone; (2) his probation officer had not told him he would go back to jail if he did not hand the phone over; (3) no caselaw held it permissible to revoke a releasee's supervised release for taking the Fifth in response to an instruction; and (4) the probation office had not sought revocation when Pulley violated his release conditions by possessing an image of a nude child. Taken together, a reasonable person in Pulley's shoes would not believe that he would go back to jail if he invoked the Fifth Amendment in response to an instruction to produce a phone for inspection.

    While unavailable to Pulley, his probation officer's testimony confirms the reasonableness of that belief. She explained at the evidentiary hearing that, had Pulley refused to identify the phone and provide it to her, she "would have instructed him that he[ is] no longer allowed to have the phone[ and] that [their] original plan of allowing him [to have the phone] would no longer be in place." Tr. 33:15–19. Instead, Pulley "would have either agreed to turn it over to a third party or discard it in some way or turn it over to [p]robation." *Id.* 33:25–34:4. In other words, Pulley would not have faced revocation for invoking his Fifth Amendment rights. At most, he would have lost access to his phone or perhaps been subject to a search of his residence—neither of which is a substantial penalty. *See Lefkowitz v. Cunningham*,

431 U.S. 801, 806 (1977) (explaining that "only penalties capable of forcing the self-incrimination which the Amendment forbids" are constitutionally significant).

Because a reasonable person in Pulley's place would not believe he faced revocation of his supervised release if he refused to produce the phone, Pulley was not in a classic penalty situation. And because he did not invoke his right not to incriminate himself, the Fifth Amendment does not require suppression of the production of his phone.

### B. Pulley Was Not Compelled to Speak About the First Phone

Pulley was likewise not compelled to answer his probation officer's questions about what she found on the first phone. His release conditions' requirement that he "shall answer truthfully all inquiries by the probation officer"—taken verbatim from U.S.S.G. § 5D1.3(c)(3) (2009)—prohibits only untruthful responses, not invoking the Fifth Amendment. *Murphy* suggested as much. *See* 465 U.S. at 437 ("On its face, Murphy's probation condition proscribed only false statements.").[4] And *McKathan* agreed. *See* 969 F.3d at 1226 ("[T]hese supervised-release provisions, on their face,

---

[4] The condition in *Murphy* required a probationer "to be truthful with the probation officer 'in all matters.'" 465 U.S. at 422; *see id.* at 437 (explaining that Murphy's condition "said nothing about his freedom to decline to answer particular questions and certainly contained no suggestion that his probation was conditional on his waiving his Fifth Amendment privilege with respect to further criminal prosecution").

13

prohibit only false statements."). While *Robinson* held otherwise, *see* 893 F.2d at 1244–45, a subsequent application note in the United States Sentencing Guidelines explains that, while the condition "requires the defendant to 'answer truthfully' the questions asked by the probation officer, a defendant's legitimate invocation of the Fifth Amendment privilege against self-incrimination in response to a probation officer's question shall not be considered a violation of this condition," U.S.S.G. § 5D1.3 cmt. n.1 (2021). *McKathan* explains that the application note "effectively abrogate[s] *Robinson*." 969 F.3d at 1230. In the light of the application note, a reasonable person would not conclude that invoking the Fifth Amendment in response to a probation officer's question would lead to revocation.

Pulley resists that conclusion in three ways. First, he contends that a "reasonable person" in 2022 would conclude that the Supreme Court's holding in *Kisor v. Wilkie*, 588 U.S. 558, 575 (2019)—that a court should not defer to an agency's interpretation of a regulation "unless the regulation is genuinely ambiguous"—applied to the sentencing guidelines commentary through *Stinson v. United States*, 508 U.S. 36 (1993), thus anticipating the Eleventh Circuit's holding in *United States v. Dupree*, 57 F.4th 1269, 1275 (11th Cir. 2023). Based on *Dupree*, he contends, a reasonable person would ignore the application note because

14

§ 5D1.3(c)(3) is not genuinely ambiguous and allows revocation if a releasee invokes the Fifth. MTS at 10–13; Def.'s Supp. Br. (Doc. 66) at 1–3. Second, he claims the application note does not apply to his release condition because he was sentenced under an earlier version of the sentencing guidelines. Def.'s Supp. Br. at 3. Third, he maintains that a reasonable person would discount the contrary language in *McKathan* as dictum. MTS at 9–10.

To start, Pulley wrongly imagines a "reasonable" person—this fanciful person is an administrative law specialist. *McKathan* does not require presuming a supervised releasee has the knowledge of a lawyer well-versed in administrative law, capable of reliably predicting future legal developments while disregarding as dicta plain statements in caselaw. To be sure, *McKathan* held that a reasonable supervised releasee would "understand *Robinson* to authorize punishment for a supervised releasee's refusal to answer his probation officer's questions." 969 F.3d at 1228. But that holding is little different from the longstanding presumption that everyone "is presumed to know the law." *United States v. Hodson*, 77 U.S. 395, 409 (1870); *see United States v. Walden*, 478 F. App'x 571, 575–76 (11th Cir. 2012) (per curiam); *Baussan v. Warden, FCC Coleman--Medium*, No. 5:11-CV-453-OC-30TBS, 2011 WL 6153153, at *3 (M.D. Fla. Dec. 12, 2011). Pulley points to no authority holding

15

that a reasonable person should be presumed to know not just what the law is, but how it will develop as cases interact and new facts arise. Nor does he explain why such a presumption would be reasonable. I therefore conclude that a reasonable person is presumed to know merely what the law is—not what it will be.

But even if Pulley should be assumed to anticipate *Dupree*, that would not change the outcome. At best, the answer-truthfully condition is ambiguous as to whether a Fifth Amendment invocation violates it. *Cf. McKathan*, 969 F.3d at 1226 ("[T]hese supervised-release provisions, on their face, prohibit only false statements."); *id.* at 1236 (Branch, J., dissenting) (same). Deference to the Sentencing Commission's interpretation of the condition would thus be appropriate, *see Dupree*, 57 F.4th at 1274–75, so the application note still "effectively abrogate[s] *Robinson*," *McKathan*, 969 F.3d at 1230.

Pulley briefly argues that, because the Sentencing Commission added the application note in the 2016 guidelines while his conditions were imposed under the 2009 guidelines, the new commentary is inapplicable to him. *See* Def.'s Supp. Br. at 3 ("Even if the 2016 Commentary eliminates any reasonable fear of revocation for defendants sentenced after 2016, it did nothing for defendants sentenced before then."). Yet Pulley cites no authority holding that amendments clarifying the

16

meaning of release conditions—particularly in favor of the releasee—do not apply retroactively. Clarifying amendments affecting sentencing, for example, apply retroactively on direct appeal, even if a defendant was sentenced under an earlier version of the sentencing guidelines. *See United States v. Horn*, 129 F.4th 1275, 1300–01 (11th Cir. 2025); *United States v. Jerchower*, 631 F.3d 1181, 1184–87 (11th Cir. 2011). And it would be nonsensical for an amendment ostensibly intended to clarify the meaning of a condition to instead create two classes of releasees with materially identical release conditions yet different restrictions in practice. I conclude instead that an amendment to the sentencing guidelines commentary clarifying a release condition's meaning applies to materially similar conditions imposed under earlier versions of the guidelines.

As for Pulley's argument that *McKathan*'s statements about the import of the 2016 amendment are dicta, that may be. But that does not necessarily mean a reasonable person would ignore them. While "dicta [are] not binding on anyone for any purpose," *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1298 (11th Cir. 2010), *McKathan*'s dicta still would inform the average reasonable person of how the Eleventh Circuit views the state of the law, *cf. Cont'l Cas. Co. v. Winder Labs., LLC*, 73 F.4th 934, 948 (11th Cir. 2023) (observing that federal courts look to state

supreme court dicta when making an *Erie* guess). And the *McKathan* Court could not have been clearer that it thought that the new application note eliminated any classic penalty situation:

> Since these application notes were made effective November 1, 2016, no supervised[ ]releasee who chose or chooses to answer questions after that date could demonstrate that he reasonably believed or believes he was or is faced with the "classic penalty situation" *Murphy* prohibits.

969 F.3d at 1230. A reasonable person would consider that statement, and, under the totality of the circumstances, conclude that he would not face revocation if he invoked the Fifth Amendment in response to a probation officer's question.[5]

## IV. CONCLUSION

Under the totality of the circumstances, a reasonable person in Pulley's place would conclude that he would not face revocation if he invoked the Fifth Amendment in response to an instruction to produce his phone or to a question from his probation officer. Pulley thus did not face a classic penalty situation, and his Fifth Amendment right was not self-executing. Because Pulley did not invoke the Fifth,

---

[5] Pulley's motion includes several conclusory claims that his probation officer compelled him to make incriminating statements about the second phone. *See* MTS at 18, 20. To the extent that Pulley seeks suppression of those statements independent of the statements or act related to the first phone, he fails to explain why the analysis would be any different.

his uncompelled act and statements are admissible against him, as is all the derivative evidence.

Accordingly, Daniel Pulley's Motion to Suppress (Doc. 41) is **DENIED**.

**ORDERED** in Tampa, Florida, on June 6, 2025.

*Kathryn Kimball Mizelle*
Kathryn Kimball Mizelle
United States District Judge